UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JAMI L. RAVEN-JONES<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>Defendant. | Case No. 3:16-cv-03766-LB<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 16 & 22 |

## INTRODUCTION

Jami L. Raven-Jones moves for summary judgment, seeking judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her Supplemental Security Income ("SSI") disability benefits under Title II and XVI of the Social Security Act.[1] Under Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties have consented to magistrate jurisdiction.[2]

The court grants Ms. Raven-Jones's motion, denies the Commissioner's cross-motion, and remands for further administrative proceedings consistent with this order.

---

[1] Motion for Summary Judgment – ECF No. 16 at 1. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Consent Forms – ECF Nos. 8, 10.

## 1. Procedural History

In May 2010, Jami Raven-Jones, a 53-year-old former drug and alcohol counselor, filed disability claims under Title II and Title XVI of the Social Security Act, alleging mental and physical impairments beginning on March 31, 2009.[3] The Commissioner denied her claims initially and on reconsideration.[4] Ms. Raven-Jones timely appealed to an Administrative Law Judge ("ALJ"), who held a hearing and issued an unfavorable decision on April 6, 2012.[5] Ms. Raven-Jones filed an appeal with the Appeals Council.[6] The Appeals Council determined that the ALJ had not adequately considered all the evidence in the record and issued an order on September 24, 2013, remanding the case to the ALJ for further proceedings.[7] A remand hearing was held on May 19, 2014, before a new ALJ, Nancy Lisewski; Ms. Raven-Jones, represented by counsel, testified, as did her social-services provider and a vocational expert.[8]

The ALJ issued her decision on September 5, 2014, ruling that Ms. Raven-Jones became disabled as of November 14, 2013, as a result of back injuries sustained in a pedestrian-motor vehicle accident that occurred after the Appeals Council's remand order.[9] But from March 31, 2009 (the date of her alleged disability's onset) to November 13, 2013 (the date of her disabling accident), the ALJ found that — while Ms. Raven-Jones suffered from severe impairments of "scleroderma, lupus, and drug and alcohol addiction"[10] — she retained sufficient residual functional capacity ("RFC") "to perform [a] full range of light work," including her relevant past

---

[3] Administrative Record ("AR") 22, 385, 429; *see also* AR 354 (Ms. Raven-Jones has a last-insured date for Title II benefits of March 31, 2014).

[4] AR 100–03, 125, 138.

[5] AR 104–15.

[6] AR 228.

[7] AR 120–23.

[8] AR 41–60.

[9] AR 24, 29–31; *see also* AR 883 (medical report noting injuries for a "pedestrian hit by car").

[10] AR 24.

United States District Court
Northern District of California

work as a drug-and-alcohol counselor; thus, she did not qualify for SSI benefits during this period.[11]

Ms. Raven-Jones appealed the decision to the Appeals Council, which affirmed on May 11, 2016.[12] Ms. Raven-Jones timely filed this action and moved for summary judgment or in the alternative for remand to the ALJ for further consideration.[13] The Commissioner responded and filed a cross-motion for summary judgment,[14] and Ms. Raven-Jones replied.[15]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Kaiser Permanente

Ms. Raven-Jones's medical records indicate that she was diagnosed and treated for scleroderma,[16] lupus, and Raynaud's disease at Kaiser Permanente from at least 2007 through February 2009,[17] with symptoms including esophageal distress ("regurgitation," "dysphasia," and "vomiting"), "abdominal discomfort," "bloating," "diarrhea, [weight] loss," and "severe finger pains" ("burning, severe pain and color changes at her fingers").[18] In January 2007, one of her treating physicians noted that prognosis for scleroderma is "usually very poor."[19]

---

[11] AR 27, 29–30.

[12] AR 1–6.

[13] Motion for Summary Judgment – ECF No. 16 at 25.

[14] Cross-Motion – ECF No. 22.

[15] Reply – ECF No. 25.

[16] The Scleroderma Foundation's website describes scleroderma as "a chronic connective tissue disease generally classified as one of the autoimmune rheumatic disease." http://www.scleroderma.org/site/PageNavigator/patients_whatis.html#.WPKHQGeGND8 (last visited Apr. 18, 2017). The Mayo Clinic reports that scleroderma can cause a wide range of symptoms, including *inter alia,* Raynaud's Phenomenon, ulcers on the fingertips, and esophageal dysfunction. http://www.mayoclinic.org/diseases-conditions/scleroderma/symptoms-causes/dxc-20206020 (last visited Apr. 18, 2017).

[17] AR 25–26. Ms. Raven-Jones's medical treatment at Kaiser predated her alleged onset date, but the ALJ considered this evidence in determining her impairment because there were no other treatment records from March 2009 to November 2010.

[18] *See* AR 538, 545, 565–66, 609.

[19] AR 545.

In June 2008, she was seen by Dr. Hsu, a Kaiser psychologist, who noted her reported history of sexual and physical abuse, presentation with a distorted/poor body image (and a potential eating disorder), mood swings, pressured speech, poor judgment, family conflict, codependent relationships, chaotic lifestyle, past cocaine and heroin addiction (clean since 2001), significant past criminal history, refusal to take mood stabilizing medication because it makes her gain weight, and frequent manic episodes.[20] Dr. Hsu diagnosed her with "multiple problems" including "alcohol dependence" and "undertreated bipolar disorder (due to [Ms. Raven-Jones's] non-compliance)."[21]

In July 2008, after an emergency room visit at Kaiser for chest pains, Ms. Raven-Jones was given a discharge diagnosis, which included "scleroderma," "[e]sophageal dysmotility causing nausea, vomiting, regurgitation," and "[a]nxiety [and] depression" (for which she was prescribed an anti-anxiety medication, Ativan (Lorazepam)).[22] Several months later in September 2008, she was seen in the Kaiser emergency room after she took an intentional overdose of Ativan; she acknowledged recent cocaine usage.[23]

In January 2009, at a rheumatology exam, the treating physician noted that Ms. Raven-Jones reported four months of "increased burning, severe pain and color changes at her fingers," after reportedly doing well for over a year (a time when Ms. Raven-Jones had stopped taking her medications on her own).[24] Her renewed symptoms coincided with an increase in her smoking, stress due to domestic violence, and the onset of colder weather.[25]

In February 2009, at a follow-up rheumatology visit, the doctor noted "systemic sclerosis / CRST . . . with worsening of Raynaud's."[26] She had not picked up her prescriptions because she

---

[20] AR 656–57.

[21] AR 658.

[22] AR 609, 611–12.

[23] AR 618–19.

[24] AR 565.

[25] Id.

[26] AR 568.

said she could not afford the co-pays[27] and she indicated that she would not stop smoking even though it likely exacerbated her Raynaud's and accompanying pain in her fingers.[28]

### 2.1.2 Alameda County Medical Center ("ACMC")

Ms. Raven-Jones does not appear to have provided the Commissioner with any medical treatment records from March 2009 until November 2010, when she sought treatment at the ACMC.[29] ACMC records noted her scleroderma and skin lesions/pain in her hands and described her fingers as "'sausage' fingers."[30] A licensed clinical social worker ("LCSW") subsequently evaluated her and referred her to group therapy.[31] The LCSW reported that Ms. Raven-Jones said she had last worked in 2009 and was "collecting unemployment" of $804 every two weeks.[32] Ms. Raven-Jones recounted her long history of sexual abuse by her father, starting as a child, and her time incarcerated as a youth (which she said that she enjoyed because it provided her safety from the abuse).[33] She acknowledged her history of polysubstance abuse, noting that her drug of choice was heroin.[34] She reiterated her resistance to any medication that caused weight gain.[35] The LCSW noted a diagnosis of bipolar II, opioid and cocaine dependence (both in "early remission"), "polysubstance abuse," "borderline personality disorder," "scleroderma," and a GAF score of 50.[36]

---

[27] *Id.*

[28] AR 568–69.

[29] AR 716–17, AR 739–40 (duplicate record).

[30] *Id.*

[31] AR 715.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.* A GAF score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. *See Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) ("A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.") (quotations omitted). "[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'" *Id.*

Several days later, Ms. Raven-Jones attended one group therapy session at ACMC, arriving late, leaving early, and stating that it was not what she was looking for.[37]

### 2.1.3 Dr. Chen: Examining Physician

Frank Chen, M.D., examined Ms. Raven-Jones on October 2, 2010.[38] At the ALJ hearing on May 19, 2014, Ms. Raven-Jones's attorney noted that Dr. Chen was removed from the approved consultative evaluation ("CE") panel of physicians for issues relating to the quality and thoroughness of his examinations and reports.[39] The ALJ said that she was aware of the situation and would give "no weight" to Dr. Chen's opinions in the report, although she later cited Dr. Chen's report in her decision as it related to Ms. Raven-Jones's self-reported daily activities.[40]

On appeal, Ms. Raven-Jones cites Dr. Chen's CE report,[41] which noted her "pain and decrease[d] range of motion of right index finger for about 2-3 years. She has burning sensation of her fingers and sometimes she has pain in her left middle finger."[42] Dr. Chen diagnosed Ms. Raven-Jones with a "[h]istory of scleroderma involving esophagus and bowel"[43] and "[r]ight index finger pain and limitations of motion, likely due to arthritis."[44] He said that she would have "some limitations in handling, feeling and fingering using the right hand" but could stand or walk for 6 hours in an 8-hour day, sit for 6 hours in an 8-hour day, and occasionally lift or carry

---

[37] AR 714.

[38] AR 664–66.

[39] AR 41–42, 28. *See Hart v. Colvin*, No. 15-cv-00623-JST, 2016 WL 6611002, at *7, *10 (N.D. Cal. Nov. 9, 2016) (approving a class-action settlement that included provisions for re-opening certain disability cases where the claimant was examined by Dr. Chen, but providing that if "Dr. Chen's CE report was explicitly afforded no weight in the analysis, that individual will not be eligible for another review of his or her claim.").

[40] AR 41, 28.

[41] Motion for Summary Judgment – ECF No. 16 at 5.

[42] AR 664–65.

[43] AR 666.

[44] *Id.*

20 pounds and frequently 10 pounds in her left arm and 10 pounds occasionally or less than 10 pounds frequently in her right arm.[45]

### 2.1.4 Dr. El-Sokkary: Examining Psychologist

On September 30, 2010, Ahmed El-Sokkary, Psy.D., examined Ms. Raven-Jones,[46] performing a psychological CE examination.[47] Ms. Raven-Jones reported a long history of sexual abuse by her father as a child and young woman and repeated institutionalization for psychiatric treatment and criminal charges.[48] Dr. El-Sokkary observed that Ms. Raven-Jones appeared "disheveled," "rambled on," "jump[ed] from one topic to another," "avoided eye contact," "cried," exhibited "pressured speech," and "appeared to be preoccupied with internal stimuli and revealed underproductive thought process."[49] He reported that she was "alert" and able to care for "hygiene, grooming, [and] daily living activities, including light cooking and cleaning," but also spent most of her time at home and reported "feeling anxious" and confused," but did not have any suicidal or homicidal ideation.[50] Dr. El-Sokkary noted that she reported being "clean from 2001 to 2008 when she relapsed and since September 2010 [when Dr. El-Sokkary examined her]."[51]

As part of the CE, Dr. El-Sokkary administered standardized psychological testing.[52] Ms. Raven-Jones's overall cognitive ability was deemed to be in the "Extremely Low" range, with a Full Scale IQ score of 67 and borderline or below normal on a range of other cognitive tests.[53] Based on this exam, and while noting its limitations as a "single" exam of limited scope and duration, Dr. El-Sokkary reached the following "diagnostic and clinical impressions:" Ms. Raven-

---

[45] Id.

[46] AR 661–63.

[47] Id.

[48] AR 661.

[49] Id.

[50] Id.

[51] AR 662.

[52] AR 663.

[53] AR 662–63.

Jones had "extremely low cognitive abilities, with symptoms of psychotic disorder."[54] Dr. El-Sokkary concluded that Ms. Raven-Jones "demonstrated a limited capacity to understand, remember, and perform simple tasks . . . and struggled to maintain a sufficient level of concentration, persistence, and pace which indicates that [s]he would have difficulty in a competitive work setting."[55] He said that Ms. Raven-Jones "struggled throughout the evaluation to adequately relate, interact, and communicate and therefore would have difficulty appropriately interacting with supervisors and co-workers at this time . . . , [and] would have difficulty keeping a regular workday/workweek schedule without interruptions from psychiatric condition[s]."[56] Dr. El-Sokkary opined that if her disability application were to be approved, Ms. Raven-Jones would not be able to "manage supplemental funds at this time."[57]

### 2.1.5 State Agency Consulting Physician/Psychologist

In November 2010, non-examining medical consultant Dr. Rudito reviewed Dr. Chen's and Dr. El-Sokkary's CEs and other reports, including Ms. Raven-Jones's Kaiser records documenting medical treatment received before her alleged onset date of disability.[58] Dr. Rudito gave "[g]reat weight" to Dr. Chen's CE and "[l]ess weight" to Dr. El-Sokkary's CE.[59] Dr. Rudito concluded that Ms. Raven-Jones was able to lift twenty pounds occasionally and ten pounds frequently, was unlimited in the ability to perform push and pull motions with her upper and lower extremities, and was limited to frequent handling, fingering, and feeling with her right hand.[60] Ms. Raven-Jones appears to have met with a social security representative, C. Mendoza, who prepared a "case

---

[54] AR 663.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] AR 678–87.

[59] AR 686.

[60] AR 679, 681.

analysis" signed by Dr. Rudito.[61] In it, Ms. Raven-Jones reported that she was in "much pain" and showed how the fingers on her hand were "bent and swollen."[62]

Dr. El-Sokkary's CE was reviewed by a non-examining consulting psychologist, Dr. Morris, who gave "little weight" to Dr. El-Sokkary's exam and Ms. Raven-Jones's self-reported mental impairments because of the lack of current supporting medical evidence, her inconsistently reported history of substance abuse, and the inconsistency between her low test scores and her educational level and prior work as a drug and alcohol counselor.[63]

### 2.1.6 TRUST Clinic: Nurse Practitioner Barber

In August 2012, Ms. Raven-Jones went to the TRUST Clinic, seeking Ativan and Clonazepam.[64] She was seen by Laurel Barber, a nurse practitioner ("NP").[65] Ms. Raven-Jones acknowledged a history of numerous incarcerations and polysubstance dependence with her "drug of choice [being] crack cocaine[,] which she binge uses," but could not remember her last use.[66] She reported hearing voices with no specific content.[67] NP Barber reported her as "very restless, mildly disheveled," with speech that was sometimes rambling, contradictory, and tangential.[68] At a subsequent visit, NP Barber noted that Ms. Raven-Jones was "irritable," demanding medication and unwilling to take any alternative mood stabilizer even if it were more appropriate than her requested medications if it would cause "weight gain."[69] NP Barber noted that Ms. Raven-Jones was alert and oriented with no overt delusions.[70] NP Barber assessed her with "unclear psych

[61] AR 684.

[62] Id.

[63] AR 677.

[64] AR 742, 744.

[65] AR 742.

[66] Id.

[67] Id.

[68] AR 742–43.

[69] AR 744.

[70] AR 745.

diagnoses," noting her Kaiser medical history of bipolar disorder, but without a clear history of mania or psychosis.[71] Given Ms. Raven-Jones's history of cocaine abuse, NP Barber could not "rule out substance induced" mood disorder, although Ms. Raven-Jones claimed to be abstinent.[72]

### 2.1.7 TRUST Clinic: Dr. Boroff, Treating Psychologist

In September 2012, Ms. Raven-Jones was seen by Michael Boroff, a psychologist at the TRUST Clinic.[73] Dr. Boroff treated Ms. Raven-Jones for ten sessions between September 2012 and April 2013.[74] In January 2013, he provided a medical assessment of Ms. Raven-Jones's mental condition,[75] diagnosing her with Bipolar Disorder I, Posttraumatic Stress Disorder ("PTSD"), Panic Disorder with agoraphobia, Alcohol Abuse, and Cocaine Abuse.[76] He found that she had a "marked" (defined as "more than moderate but less than extreme") limitations in her ability to accomplish activities of daily living, "extreme" limitations in her "social functioning," and "extreme" deficiencies in "concentration, persistence or pace."[77] Dr. Boroff found that Ms. Raven-Jones would be unable to maintain adequate attention to perform even simple tasks in a work setting, would be unable to interact appropriately with supervisors or co-workers, and would have difficulty keeping a regular work schedule.[78] In November 2013, Dr. Boroff wrote a follow-up report, noting that Ms. Raven-Jones's anxiety and depression had become so problematic that she struggled to leave her home or take public transportation and that these mental-health issues had prevented her from attending psychotherapy and medical appointments, necessitating the clinic to send in-home support.[79] Dr. Boroff opined that while Ms. Raven-Jones had "a history of

---

[71] *Id.*

[72] *Id.*

[73] AR 746.

[74] AR 742–72.

[75] AR 759–65.

[76] AR 760.

[77] AR 764.

[78] AR 763.

[79] AR 800.

alcohol and drug use, as well as criminal behavior . . . , her mood and trauma issues are the biggest contributor to her dysfunction."[80] Dr. Boroff found her to be "severely depressed and anxious to the point that she cannot even access help."[81] He concluded by observing that "[i]n a clinic that serves severely mentally ill homeless and precariously housed adults, Ms. Raven-Jones remains one of our lowest functioning clients."[82] Dr. Boroff's findings were broadly consistent with his treatment notes.[83]

### 2.1.8  Life Long Medical Care & Native American Health Center

In July 2012, Ms. Raven-Jones was examined at Life Long Medical Care ("LLMC"), where she complained of severe pain in her hands and right foot, with noted medical issues of

---

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *See, e.g.,* AR 746–47 (Ms. Raven-Jones noted a history of sexual abuse, substance abuse, incarceration, and mental health issues, including being "afraid of everything" and being unable to leave her home without anti-anxiety medication; Dr. Boroff noted her memory issues, tearfulness, and reported visual hallucinations — diagnosed: Bipolar I); AR 748–49 (Ms. Raven-Jones reported "constant state of terror" and being afraid to go outside or even into her bedroom; unable to sleep because of her fears — diagnosed: Bipolar I and PTSD); AR 750–51 (Ms. Raven-Jones appeared more lucid but thoughts still scattered, speech was pressured and her mind appeared to be racing; spontaneous tears; reported hyperventilating on bus because of fear; described fear of going out or being around "too many people" – diagnosed: Bipolar I, PTSD, panic disorder without agoraphobia); AR 752–53 (Ms. Raven-Jones reported repeated urge to leave a Walmart after anxiety attack, general increase in anxiety — diagnosed: Bipolar I, PTSD, panic attacks, nondependent alcohol abuse, and cocaine abuse); AR 754 (Dr. Boroff noted that Ms. Raven-Jones's anxiety, depression, and PTSD continue to be significant problems; she reported safety concerns about her neighborhood and "spends large amounts of time frozen, hiding from unseen threats in her home"; she is unable to enter her bedroom "anymore because she feels unsafe" there — diagnosed: Bipolar, PTSD, panic disorder without agoraphobia); AR 756 (increased state of distress, severe PTSD symptoms, "re-experiencing past traumas, disassociating and freezing up, hypervigilance, and anxious pacing around her home," "some suicidal ideation but denied intent," on constant guard for her safety, unable to rest because of fears, she increased her Ativan dosage but reported minimal benefit); AR 767 (Ms. Raven-Jones returned to clinic after two months' absence, relapsed to drinking over holidays, felt depressed because of anniversary of her mother's death, voluntarily entered detox program, reported being sober since leaving program in January, but appeared low energy and more depressed than her typical mixed state); AR 769 (Ms. Raven-Jones reported feeling "extremely anxious;" she feels unsafe in certain rooms of her home and reported increased stress as she may lose section 8 housing due to outstanding bill from years ago); AR 771 (Ms. Raven-Jones returned to clinic after another two months' absence; she "remains unable to develop a plan for attending medical and mental health a appointments regularly").

scleroderma, lupus, anxiety, depression, insomnia, and other ailments.[84] Ms. Raven-Jones

presented as anxious and crying with visible scleroderma ("thickened and contracted skin –

facial/hands").[85] She said that she was out of her "meds" (noted as "Ativan/pain meds") and been

sent to the LLMC by her "SSI lawyer," who told her she could get them refilled at the LLMC.[86]

She was provided with some medications and instruction to follow-up with a rheumatologist

"ASAP."[87] It does not appear that she sought or received any immediate follow-up care. About a

year later, in July 2013, Ms. Raven-Jones was examined at the Native American Health Center

("NAHC") with similar complaints of pain in her hands and feet and her continued symptoms

from lupus, scleroderma, Reynaud's, and other ailments for which she was seeking medications.[88]


### 2.1.9 Highland Hospital: Pamela Suzanne Portnoy, Nurse Practitioner

In April 2014, NP Portnoy, one of Ms. Raven-Jones's treatment providers, wrote a letter

noting that (1) while she had seen Ms. Raven-Jones only once, her complications from lupus and

scleroderma with Raynaud's phenomena would generally create issues of chronic pain and

endurance and decreased manual dexterity, and (2) from her initial impression of Ms. Raven-

Jones, her "anxiety, in and of itself, is disabling and would make fulltime employment highly

unlikely."[89]


### 2.2 Ms. Raven-Jones's Testimony

Ms. Raven-Jones testified twice in support of her disability claim.[90] On March 19, 2012, she

testified before the original ALJ.[91] She was questioned by both the ALJ and her attorney; the ALJ

---

[84] AR 782.

[85] AR 782–83.

[86] AR 782.

[87] AR 783.

[88] AR 774.

[89] AR 856.

[90] AR 66–80, 42–49.

[91] AR 66–80.

initially asked her about her educational background, work history, and medical history.[92] She

testified that she was not currently working and had received a certificate from Cal State but was

unable to earn an "AA degree" because she had only a seventh grade education attained while she

was incarcerated as a youth and was on a lot of "psychotropic medication.[93] She noted that she had

previously received medical services at Kaiser but had not seen any treating doctors in the last two

years.[94] She noted that she had "paranoia" and "really bad anxiety" so she would "just stay in [her]

house."[95] She likes to have her windows covered and takes Ativan for her "emotions" and suffers

from depression but is generally "more anxious than depressed."[96] She noted that she gets "panic

attacks daily" or "[a]lmost every day" that can be triggered by "conflict" or being around "other

people that [she] do[es]n't know."[97] She noted that she rarely leaves the house, her brother brings

her groceries, and other family members help with household chores.[98] She has trouble

"remembering" and being able to "focus."[99]

　　She also stated that she had "dermal lupus" and that it had "destroyed [her] fingers and [her]

legs" and that she was trying to get medical attention at the County Hospital and had an upcoming

appointment.[100] She reported having scleroderma in her esophagus and bowels, causing her to

"choke on everything [she] eats" and take medication.[101] She described having scleroderma-

related lesions on both hands, including ulcers on her fingers.[102] In response to questioning from

---

[92] *Id.*

[93] AR 67–68.

[94] AR 68–69.

[95] AR 69.

[96] AR 71, 76, 78–79.

[97] AR 77.

[98] AR 78–79.

[99] AR 78.

[100] AR 69–70.

[101] AR 70–71.

[102] AR 74–75; *see also* AR 63, 94 (Ms. Raven-Jones gave her testimony from the lobby of the building where the hearing took place because she did not have an ID and was not allowed to enter the building. The ALJ thus was not able to directly observe her physical condition and demeanor).

the ALJ, she denied ever passing out from alcohol consumption and said she had been in remission from cocaine abuse for about a year.[103]

On May 19, 2014, Ms. Raven-Jones testified on remand before ALJ Lisewski.[104] Ms. Raven-Jones stated that after working for 10 years (and graduating from Merritt College), she was unable to continue after having a "crisis" and getting "really sick" with lupus and systemic scleroderma, which forced her to miss too much work.[105] She supported herself with unemployment insurance for 99 weeks but that eventually ran out.[106] She acknowledged that she has had problems with drugs or alcohol, but maintained that she was clean and sober and had been for "[c]lose to two years," with the support of Narcotics Anonymous ("NA"); in her current state, it was hard for her to leave her home but some of the NA members would come to her.[107] She noted that in 2010, when she first applied for benefits, she was experiencing Raynaud's Syndrome with lesions, called "ulcers," on the tips of her fingers.[108]

She described the difficulty she has writing, opening plastic packaging, pushing buttons, and doing other things with her hands and fingers.[109] She described her difficulty in leaving her home and how she keeps all the windows covered.[110] She uses a walker and has a relative help her with bathing, because of limitations in her arm movement.[111]

---

[103] AR 72–73.

[104] AR 42–49.

[105] AR 43.

[106] AR 43–44.

[107] AR 44.

[108] AR 45.

[109] AR 46–47.

[110] AR 47–48.

[111] AR 48.

### 2.3 Lay Testimony: Brother Wilson Buckley

At Ms. Raven-Jones's first hearing in March 2012, Ms. Raven-Jones's older brother, Wilson Buckley, testified.[112] He said that Ms. Raven-Jones's hands were swollen and bluish-green in color, she had difficulties using her hands (including dropping things and an inability to grip), and her fingernails looked as if they are about to "pop off" with "open sores" that "never close."[113] He reported her difficulty eating, with things getting stuck in her throat and being "regurgitate[d]."[114]

He also described how he or his wife would help her with fastening buttons, zippers, or other actions requiring her hands.[115] He noted her difficulty in some household tasks and said that she could mingle when folks come over, but also said that much of the time, she sits by herself watching television.[116] She still has a friendship with her ex-husband.[117]

### 2.4 Social Worker Testimony: Andrea Zeppa

At the May 2014 remand hearing, Ms. Raven-Jones's social worker/case manager, Andrea Zeppa, testified.[118] Ms. Zeppa said she had known Ms. Raven-Jones since August 2012 and regularly visited her home, seeing Ms. Raven-Jones on 23 occasions, helping her get ready and go to medical appointments, fill out necessary forms, and otherwise assist with her with other errands or tasks.[119] On occasion, Ms. Raven-Jones was unable to leave the house because she was too depressed, tired, or sick.[120] When "stressed," Ms. Raven-Jones has difficulty communicating, becoming agitated and defensive or shutting down and falling asleep, even in public settings.[121]

---

[112] AR 81.

[113] AR 82, 87.

[114] AR 88.

[115] AR 83–86.

[116] AR 89–90, 94–95.

[117] AR 90.

[118] AR 49–54.

[119] AR 50; *see also* AR 53 (noting that Ms. Raven-Jones's scleroderma and associated ulcers made it difficult for her to write or fill out medical forms, etc.)

[120] AR 50–51.

[121] AR 52.

Ms. Raven-Jones had trouble taking public transportation and making her doctor's appointments, which prompted the Trust Clinic to initiate home visits.[122] In April 2014, Ms. Zeppa prepared a written summary of her 23 service encounters with Ms. Raven-Jones, detailing her observations and experiences (and signed by both Ms. Zeppa and Dr. Boroff).[123] Her report included details of an encounter at Ms. Raven-Jones's home in June 2013; when Ms. Zeppa arrived, two family members were present, and Ms. Raven-Jones said that she had just learned that her granddaughter was graduating that afternoon.[124] Ms. Raven-Jones said that although she was continuing to experience symptoms of lupus, scleroderma, anxiety, and depression, she wanted to go — even though she was "anxious" about going and "worried about being in a large crowd."[125] Ms. Zeppa helped to calm and reassure her, which seemed to help a little as she was "overwhelmed about staying in the crowd for the entire ceremony."[126]

### 2.5 Vocational Expert Testimony: Jeff Beeman

Jeff Beeman, a vocational expert ("VE"), testified at the remand hearing on May 19, 2014.[127] After reviewing Ms. Raven-Jones's past work as a van driver and a drug-and-alcohol counselor, the ALJ posed two hypothetical questions.[128] First, the ALJ asked if someone restricted to light work would be able to work as a van driver or a drug-and-alcohol counselor.[129] The VE responded that such a person could not work as a van driver but could work as a drug-and-alcohol counselor.[130] Second, the ALJ asked if someone restricted to light work, limited to simple, routine

---

[122] AR 51–52.

[123] AR 858–72.

[124] AR 863.

[125] Id.

[126] Id.

[127] AR 54–59.

[128] AR 55–57.

[129] AR 57.

[130] Id.

tasks, and off task 25% of the day would be able to work in either position.[131] The VE said that such a person would not be employable.[132]

Ms. Raven-Jones's attorney then asked a hypothetical question: would there be any jobs for a person with the same educational and vocational background as Ms. Raven-Jones with the following: limited capacity to understand, remember, and perform simple tasks; struggled to maintain a sufficient level of concentration, persistence, or pace, and would have difficulty in a competitive work setting; struggled through the evaluation to adequately relate, interact, and communicate and therefore would have difficulty interacting with co-workers and supervisors; and had difficulty keeping a regular work day/work week without interruptions from psychologically based systems, resulting in missing at least one work day per week.[133] The VE responded, "Not employable."[134] The attorney asked whether there were any jobs for a person who — due to a deficit in concentration, persistence, and pace — would be unable to meet competitive standards up to 15% of the day and would be unable to interact appropriately with co-workers and supervisors up to 15% of the day.[135] The VE testified such a person would not be employable.[136]

### 2.4 Administrative Findings

The ALJ held that Ms. Raven-Jones was not disabled within the meaning of the Social Security Act from the alleged onset date of March 31, 2009, until November 14, 2013, the date Ms. Raven-Jones became disabled as a result of unrelated back injuries sustained in a pedestrian-motor vehicle accident.[137]

---

[131] *Id.*

[132] *Id.*

[133] AR 58–59.

[134] AR 59.

[135] *Id.*

[136] *Id.*

[137] AR 24, 29–31.

The ALJ observed that the Commissioner has established a sequential five-step evaluation process to determine if an individual is disabled.[138] At step one, the ALJ must determine whether the individual is engaging in "substantial gainful activity."[139] At step two, the ALJ must determine whether the individual has a "medically determinable impairment" that is "severe" or a combination of impairments that is "severe."[140] At step three, the ALJ must determine whether the individual's impairments are severe enough to meet a "listed" impairment.[141] At step four, the ALJ must determine the individual's "residual functional capacity" and determine whether the individual can perform "past relevant work."[142] At step five, the ALJ must determine whether the individual can perform any other work.[143]

At step one, the ALJ found that that Ms. Raven-Jones had not engaged in substantial gainful activity since March 31, 2009, the alleged onset date.[144]

At step two, the ALJ found that Ms. Raven-Jones had the following severe impairments: "scleroderma, lupus, and drug and alcohol addiction."[145]

At step three, the ALJ found that Ms. Raven-Jones did not have an impairment or combination of impairments that met or medically equaled the severity requirements for any listed impairment.[146]

At step four, the ALJ reviewed and assessed the medical and other evidence and determined that Ms. Raven-Jones had the "residual functional capacity [("RFC")] to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)."[147]

---

[138] AR 22–24.

[139] AR 23.

[140] *Id.*

[141] *Id.*

[142] AR 23–24.

[143] AR 24.

[144] *Id.*

[145] *Id.* (the ALJ found that beginning on November 13, 2013, Ms. Raven-Jones had severe impairments arising from a motor vehicle accident).

[146] AR 25.

[147] AR 27.

Because the ALJ determined that Ms. Raven-Jones had the RFC to perform past relevant work, the ALJ did not go to step five to determine whether Ms. Raven-Jones could perform any other work.[148] The ALJ determined that Ms. Raven-Jones was not disabled from the March 31, 2009 alleged onset date until November 14, 2013, when she was injured in a pedestrian-motor vehicle accident.[149]

## ANALYSIS

### 1. Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates the suit within 60 days of the decision. District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotations omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.* at 1039–40; *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

### 2. Applicable Law

An SSI claimant is considered disabled if he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[148] *See* AR 29–30.

[149] AR 31.

United States District Court
Northern District of California

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A), (B).

The Commissioner uses a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's residual functional capacity ("RFC"), is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. *See* 20 C.F.R. § 404.1520(a)(4)(v).

For steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098. At step five, the burden shifts to the Commissioner to show that the claimant can do other kinds of work. *Id.*

### 3. Application

In her motion for summary judgment, Ms. Raven-Jones alleges that the ALJ erred by (1) failing to properly evaluate and weigh the medical-opinion evidence when making her RFC finding (for both Ms. Raven-Jones's physical and mental impairments), (2) rejecting or failing to consider testimony and other evidence from "other sources," medical and lay, and (3) failing to provide clear and convincing evidence of a specific and legitimate basis for finding that Ms. Raven-Jones's testimony was "not entirely credible."[150] The court addresses each claim in turn.[151]

### 3.1 The ALJ Erred by Failing to Properly Evaluate and Weigh the Medical-Opinion Evidence

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). An ALJ may not, however, interject or substitute her own medical opinion or diagnosis for that of the claimant's physician. *See Tackett*, 180 F.3d at 1102–03; *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is prohibited from making his own medical assessment beyond that demonstrated by the record); *see also Ladue v. Chater*, No. C-95-0754 EFL, 1996 WL 83880, at *3 (N.D. Cal. Feb. 16, 1996) ("[d]isability hearings are not adversarial in nature" and "the ALJ has duty to develop the record" and "inform himself about [the] facts," even if "the claimant is represented by counsel").

In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must [also] consider the entire record as a whole and may not affirm simply by isolating a

---

[150] *See* AR 27 (finding that Ms. Raven-Jones's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible prior to November 14, 2013, for the reasons explained in this decision").

[151] Motion for Summary Judgment – ECF No. 16 at 8–21. Ms. Raven-Jones also challenges the ALJ's findings about Ms. Raven-Jones's RFC, the severity of her listed impairments, and her ability to perform her past work during the relevant period. Because these challenges are intertwined with (and turn on) the three main claims asserted by Ms. Raven-Jones on appeal, the court does not address these claims individually and instead consider them in the context of three main claims.

specific quantum of supporting evidence.") (internal quotations omitted)). An ALJ may not, without explanation, ignore medical evidence of a claimant's other impairments. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Garrison*, 759 F.3d at 1012–13 ("In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it . . . ."); *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996).

Social Security regulations distinguish between three types of physicians (and other "acceptable medical sources"): treating physicians; examining physicians; and non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen*, 80 F.3d at 1285.

Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (alteration in original) (internal quotations omitted). If the ALJ finds that the opinion of a treating physician is contradicted, the ALJ must provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotations omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotations omitted)). "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Id.*; *see also* 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the claimant's] case record, we will give it

controlling weight."); *Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987) (the opinion of a

treating physician is generally given the greatest weight because the treating physician "is

employed to cure and has a greater opportunity to know and observe the patient as an individual").

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(b)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)).

Even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996), 61 Fed. Reg. 34,490, 34,491 (July 2, 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* (quoting SSR 96-02p at 4).

Moreover, to the extent that the reasons that the ALJ identifies for discrediting a treating physician's findings are contradicted by the record, they are not legitimate. *See Garrison*, 759 F.3d at 1012 (the ALJ must show "legitimate reasons that are supported by substantial evidence" to reject a treating physician's opinion); *cf. Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (upholding the ALJ's decision to reject an examining medical provider's assessment which conflicted with the provider's own medical reports and testing).

Finally, an "ALJ errs when he rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13.

Here, the ALJ found that Ms. Raven-Jones had severe impairments of "scleroderma, lupus, and drug and alcohol addiction" and that these "medically determinable impairments could reasonably be expected to cause the alleged symptoms."[152] The ALJ concluded, however, that "the intensity, persistence, and limiting effects of [Ms. Raven-Jones's] symptoms" were such that Ms. Raven-Jones retained the RFC "to perform a full range of light work," was capable with this RFC of performing her past work as a drug-and-alcohol counselor, and therefore was not disabled during the relevant time period.[153]

### 3.1.1 Mental Impairments — Drug and Alcohol Addiction

As an initial matter, the ALJ failed to adequately recognize and consider all of Ms. Raven-Jones's mental impairments that were supported by medical evidence, including, *inter alia*, depression, bipolar disorder I & II, PTSD, anxiety, and panic disorder.[154] *See Smolen*, 80 F.3d at 1282 (the ALJ erred when he, without explanation, "ignored medical evidence of [the claimant's] other impairments"). The ALJ's failure to do so is an error.[155] *Id.*

---

[152] AR 24, 27.

[153] AR 24–31.

[154] *See* AR 24 (the ALJ found only that Ms. Raven-Jones had impairments of "scleroderma, lupus, and drug and alcohol addiction").

[155] *See* AR 25–26 (in determining whether any of Ms. Raven-Jones's impairments met the severity requirements for a listed impairment under Step 3, the ALJ acknowledged that Ms. Raven-Jones had the additional impairment of "anxiety," which the ALJ noted was a "medically determinable impairment," but, without explanation or citation to the medical record, concluded that it was a "minimal limitation" and did not rise to the level of one of the listed impairments specified in the regulations; the ALJ also noted that Ms. Raven-Jones was diagnosed with bipolar II disorder, but did not discuss it further except to characterize her "sporadic" and "often noncompliant" treatment history and to conclude broadly that "the claimant's medically determinable mental impairment causes no more than 'mild' impairment in any of the first three functional areas and 'no' periods of decompensation which have been of extended duration in the fourth area; it is non-severe.").

In finding that the intensity, persistence, and limiting effects of Ms. Raven-Jones's mental impairments (and the symptom associated them) did not give rise to a disability, the ALJ "decline[d] to assign controlling weight" to the medical opinion of Dr. Boroff, Ms. Raven-Jones's treating psychologist, who opined that Ms. Raven-Jones would have significant limitations in her ability to work.[156] Because the ALJ's determination was not based on a contradictory medical opinion, the ALJ must provide clear and convincing reasons that are supported by substantial evidence for her declination. *See Ryan*, 528 F.3d at 1198; *Lester*, 81 F.3d at 830–31. The ALJ gave two reasons for not giving controlling weight to Dr. Boroff's opinion: (i) the "limited number" of interactions Dr. Boroff had with Ms. Raven-Jones, and (ii) his lack of opportunity to review Ms. Raven-Jones's full medical record, which "demonstrate[s] [her] noncompliance with treatment and her intermittent drug use."[157] Neither of these reasons is a clear and convincing reason supported by the substantial evidence necessary to uphold the ALJ's decision.

Regarding the number of interactions, Dr. Boroff saw Ms. Raven-Jones over the course of ten sessions between September 2012 and April 2013, lasting from 15 to 60 minutes each.[158] The Ninth Circuit has observed that — in determining whether a physician or other "acceptable medical source" should be considered a "treating physician" with the associated presumption (at least initially) of controlling weight — "[i]t is not necessary, or even practical, to draw a bright line distinguishing a treating physician from a non-treating physician. Rather, the relationship is better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact." *Benton v. Barnhart*, 331 F.3d 1030, 1038 (9th Cir. 2003) (quoting *Ratto v. Sec'y of Health and Human Servs.*, 839 F. Supp. 1415, 1425 (D. Or. 1993)); *see Ghokassian v. Shalala,* 41 F.3d 1300, 1303–04 (9th Cir. 1994) (physician who saw claimant twice in fourteen-month period was considered a treating physician); *Le v.*

---

[156] AR 28; *see also* AR 759–60 (letter from Dr. Boroff); AR 761–65 (mental-impairment questionnaire completed by Dr. Boroff).

[157] AR 28.

[158] AR 761 (confirming first seven sessions and typical duration), AR 800 (noting three additional sessions); *see generally* AR 746–71.

*Astrue*, 529 F.3d 1200, 1201–02 (9th Cir. 2008) (in an attorney's fees case, noting that the court in the underlying substantive disability case found that a doctor who treated the claimant "five times in three years for treatment of severe psychological problems" was a treating physician); *cf. Acord v. Colvin*, 571 F. App'x 522, 522 (9th Cir. 2014) (substantial evidence supported the ALJ's according little weight to treating physician who had "reached his conclusion after one visit"); *Holohan*, 246 F.3d at 1203 n.2 (noting that "[u]nder certain circumstances, a treating physician's opinion on some matter may be entitled to little if any weight . . . for instance, if the treating physician has not seen the patient long enough to have obtained a longitudinal picture") (internal quotation marks omitted).

Here, Dr. Boroff diagnosed and treated Ms. Raven-Jones over the course of ten sessions, each documented with detailed evaluation and treatment notes.[159] In these circumstances, Dr. Boroff was Ms. Raven-Jones's treating psychologist, requiring the ALJ to provide clear and convincing reasons for not giving controlling weight to or otherwise discounting his medical opinion. *See Benton*, 331 F.3d at 1038; *Ryan*, 528 F.3d at 1198; *Garrison*, 759 F.3d at 1012–13; *see also* 20 C.F.R. § 404.1527(c)(2).

Moreover, it appears that some of Ms. Raven-Jones's purported symptoms relating to her mental impairments — including her social anxiety, discomfort at being outside her home, and depression — contributed to her relatively limited number of sessions with Dr. Boroff.[160] In November 2013, Dr. Boroff noted that Ms. Raven-Jones's "anxiety and depression [had] become so problematic that she struggle[d] to leave home" and had "missed so many appointments that [Dr. Boroff] was not able to continue scheduling her."[161] While a claimant's lack of treatment can

---

[159] AR 746–72; *see also supra* n. 83 (summarizing Dr. Boroff's treatment notes of Ms. Raven-Jones); AR 858–72 (a written summary signed by both Dr. Boroff and Ms. Raven-Jones's social worker/case manager, Ms. Zeppa, detailing almost 100 interactions with Ms. Raven-Jones or on her behalf by the Ms. Zeppa or other case workers between August 2012 and April 2014).

[160] *See, e.g.*, AR 759 (noting that "[e]ven with the medication, she struggles to leave her house, leading to missed appointments), AR 676 (noting her return to the clinic for "first time in two months" after a depression-related substance-abuse relapse), AR 800 (noting that she made it to her therapy session only three times between January and April 2013 because of her anxiety and depression, and noting that "[s]he cannot take public transportation because of her anxiety, and she has no other means of transportation").

[161] AR 800.

be evidence of the lack of severity of such claimant's reported symptoms, *see, e.g.*, *Orn*, 495 F.3d at 636, the Ninth Circuit has repeatedly cautioned that in the area of mental health, the fact that a claimant "may have failed to seek psychiatric treatment for his [or her] mental condition" should not be used to "chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen*, 100 F.3d at 1465 (internal quotations omitted); *Ferrando v. Comm'r of Soc. Sec. Admin.*, 449 F. App'x 610, 611–12 (9th Cir. 2011) ("[F]ailure to seek treatment for his mental illness . . . is not a clear and convincing reason to reject his [treating] psychiatrist's opinion, especially where that failure to seek treatment is explained, at least in part, by [the claimant's] degenerating condition.") (citing *Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) (noting that the Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental complaints")).

Second, in terms of Dr. Boroff's access (or lack thereof) to Ms. Raven-Jones's medical history, it appears that the Trust Clinic — where Dr. Boroff worked and presumably had access to his patients' medical records — did have at least some of Ms. Raven-Jones's overall medical records from Kaiser from 2008.[162] More to the point, the purported reason cited by the ALJ about why Dr. Boroff would benefit from access to Ms. Raven-Jones's "overall record" is that it would "demonstrate [her] noncompliance with treatment and her intermittent drug use."[163] Two facts that Dr. Boroff knew from his sessions with Ms. Raven-Jones, from her initial intake at the Trust Clinic (when she outlined her history of polysubstance abuse), and from her repeated difficulty in attending her scheduled sessions with Dr. Boroff, which led to a shift to an "in-home" support care model.[164]

Given these circumstances, the ALJ's reasons for rejecting the medical opinion of Ms. Raven-Jones's treating psychologist, Dr. Boroff, are not clear and convincing (or necessarily even

---

[162] AR 744 (noting "Kaiser 2008 records" as "[s]ource of information").

[163] AR 28.

[164] AR 742 (noting her polysubstance abuse history); AR 800 (Dr. Boroff noted that because of her anxiety and depression, Ms. Raven-Jones "struggles to leave her home," requiring Dr. Boroff to shift to an in-home support model and to stop scheduling her appointments).

1    legitimate) reasons supported by substantial evidence. *See Orn*, 495 F.3d at 632; *Garrison*, 759

2    F.3d at 1012.

3         The ALJ also placed "little weight" on the opinion of the State agency's examining

4    psychologist, Dr. El-Sokkary, who opined, like Dr. Boroff, that Ms. Raven-Jones would have

5    significant limitations in her ability to work.[165] In support of this weighting, the ALJ reasoned that

6    Dr. El-Sokkary had seen Ms. Raven-Jones only once and, as the ALJ did with Dr. Boroff,

7    discounted Dr. El-Sokkary's medical opinion by noting that he did not have access to Ms. Raven-

8    Jones's "overall record" showing her "limited mental health treatment" and "intermittent

9    polysubstance abuse."[166] The ALJ also found Ms. Raven-Jones's poor results on the cognitive

10   tests administered by Dr. El-Sokkary to be "suspect" because they were inconsistent with the

11   ALJ's findings that Ms. Raven-Jones had obtained a "college degree" and had worked as a drug

12   and alcohol counselor.[167]

13        First, "[a]s is the case with the medical opinion of a *treating* physician, the [ALJ] must [also]

14   provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an *examining*

15   physician." *Lester*, 81 F.3d at 830–31 (emphasis added). As an examining medical provider

16   performing a consultative evaluation ("CE") in a disability claim, the fact that Dr. El-Sokkary

17   examined Ms. Raven-Jones only once is hardly surprising and does not by itself provide a

18   legitimate basis to reject Dr. Sokkary's medical opinion in the CE. *See, e.g.*, *Wiggins v. Berryhill*,

19   No. 1:16-cv-41-GSA, 2017 WL 772142, at *8 (E.D. Cal. Feb. 27, 2017) (noting that the medical

20   opinion was "a one-time snapshot of [claimant's] functioning," but concluding that "that is true of

21   all consultative examiners and it is not a legitimate reason for rejecting the opinion"); *Smith v.*

22   *Colvin*, No. 14-cv-05082-HSG, 2015 WL 9023486, at *7 (N.D. Cal. Dec. 16, 2015) ("By

23   definition, an examining opinion is a one-time examination.") (citing *Giather v. Colvin*, No. 12-

24   cv-10933-DTB, 2014 WL 632371, at *3 (C.D. Cal. Feb. 18, 2014)). "Adoption of the ALJ's

25

26   _____

27   [165] AR 28; *see also* AR 663.

     [166] AR 28.

28   [167] *Id.*

reasoning would result in the rejection of virtually all examining opinions." *Smith*, 2015 WL 9023486 at *7 (citing *Sprout v. Astrue*, No. 09-cv-01676-SKO, 2011 WL 300210, at *7 (E.D. Cal. Jan. 27, 2011) ("The suggestion that an opinion is inadequate simply because it resulted from a onetime examination leads to the [untenable] conclusion that all examining physician opinions should be discarded.")).

Second, as part of the CE, Ms. Raven-Jones did disclose her history of polysubstance abuse to Dr. El-Sokkary, as well as her history of physical and mental illnesses.[168] As such, the absence of her full medical record (providing additional data points on her "intermittent polysubstance abuse" and "limited mental health treatment") was unlikely to alter or affect Dr. El-Sokkary's evaluation of her mental impairments, as intimated by the ALJ.[169]

Third, as to whether Ms. Raven-Jones's educational background was a basis for finding her low test scores to be "suspect," the record is somewhat unclear. It appears that Ms. Raven-Jones did attend college classes and claimed at her hearing before ALJ Lisewski that she "graduated from Merritt College," but she also testified at her first hearing before her original ALJ that she finished only seventh grade and as a result was able to obtain only a "certificate" rather than a college "degree," as noted by ALJ Lisewski in her decision.[170] It is also noteworthy that Ms. Raven-Jones's educational and work activities cited by the ALJ in support of her discounting Ms. Raven-Jones's test scores predated her alleged onset date.

In sum, given these facts, the ALJ's reasons for giving "little weight" to Dr. El-Sokkary's uncontradicted medical opinion — based upon his one-time exam and lack of access to Ms. Raven-Jones's full medical treatment record and substance abuse history — are not clear and convincing reasons supported by substantial evidence. *See Lester*, 81 F.3d at 830–31.

On appeal, Ms. Raven-Jones also contends that ALJ erred by placing little weight on the "state agency medical and psychological consultants" because the ALJ found that their assessments

---

[168] AR 662.

[169] *See* AR 28.

[170] *Compare* AR 67–68, *with* AR 43; *see also* AR 332 (Ms. Raven-Jones's annual earnings as a drug and alcohol counselor never exceeded the mid-thirty-thousand-dollar range).

predated the "motor vehicle accident that occurred in November 2013."[171] While it is unclear

whether the ALJ is referencing the state agency "consulting" or "examining" personnel,[172] in

either case, this rationale for discounting or failing to discuss either set of medical opinions —

because they do not reflect subsequent, post-accident information — is not a legitimate reason to

disregard such medical opinions regarding Ms. Raven-Jones's eligibility for disability *before* her

accident (*i.e.*, from the alleged onset date to the date of her disability arising from her accident).[173]

*See Reddick*, 157 F.3d at 725 (the ALJ must provide "specific and legitimate reasons supported by

substantial evidence in the record" for its decision).

   The ALJ also declined to "place significant weight on [the] opinion" of Ms. Raven-Jones's

social worker/case manager, Ms. Zeppa,[174] because she was not an "acceptable medical source."[175]

The ALJ correctly found that, as a social worker, Ms. Zeppa is an "other [medical] source," rather

than an "acceptable medical source," and that her testimony or medical opinion could not be used

to "establish the existence of a medically determinable impairment." *See Ghanim v. Colvin*, 763

F.3d 1154, 1161 (9th Cir. 2014) ("Only physicians and certain other qualified specialists are

considered '[a]cceptable medical sources.'") (citing *Molina*, 674 F.3d at 1111) (alteration in

original); *see also* SSR 06–03p, *available at* 2006 WL 2329939 (noting that medical sources who

are not "acceptable medical sources" include licensed clinical social workers).

   The ALJ also correctly noted that evidence from "other sources" can be used to "provide

insight into the severity of the impairment(s) and how it affects the [claimant's] ability to

---

[171] Motion for Summary Judgment – ECF No. 16 at 9–10; AR 28 (ALJ decision).

[172] *See* AR 28 (the nomenclature used by the ALJ refers to the examining psychologist as the "psychological *consultative* examiner" and likewise to the "medical *consultative* examiner" (emphasis added), so it is not entirely clear what she means when she says, "state agency medical and psychological consultants," though likely — based on her summary about them next in the opinion — it is Drs. El-Sokkary and Chen).

[173] *Id.* (to be clear, to the extent the ALJ discounted such reports with regard to Ms. Raven-Jones's eligibility for disability *post*-accident, because of her intervening disabling injuries, such discounting is legitimate and supported by substantial evidence).

[174] *Id.* (in her decision, the ALJ incorrectly refers to her as Ms. "Seppa" rather than "Zeppa").

[175] *Id.*

function."[176] *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011) ("other source" testimony may be introduced "to show the severity of [the claimant's] impairment(s) and how it affects [his] ability to function" (citing 20 C.F.R. § 404.1513(d)).

The ALJ is required to consider "other source" testimony and evidence from another "medical source" or a lay person. *See Ghanim*, 763 F.3d at 1161; *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work."); *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). It is competent evidence and "cannot be disregarded without comment." *Nguyen*, 100 F.3d at 1467. Moreover, if an ALJ decides to disregard the testimony of a lay witness, the ALJ must provide "specific" reasons "that are germane to each witness." *Id.; Bruce*, 557 F.3d at 1115 (the reasons for rejecting "other source" witness testimony must be "germane" and "must be specific"); *Stout*, 454 F.3d at 1054 (explaining that "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony"); *Ghanim*, 763 F.3d at 1161 (the ALJ may "discount testimony from these 'other sources' if the ALJ gives reasons germane to each witness for doing so.") (internal quotations omitted).[177]

The ALJ discounted Ms. Zeppa's opinion because (i) she was not an "acceptable medical source" and hence "is not qualified to diagnose the claimant" and (ii) "she largely arranged social services for the claimant."[178] The first reason, while accurate, is circular in its reasoning and ignores the probative value of Ms. Zeppa's testimony regarding the severity of Ms. Raven-Jones's impairments and their impact on her ability to work. *See Haagenson v. Colvin*, 656 F. App'x. 800, 802 (9th Cir. 2016) (holding that the ALJ failed to provide a germane reason for rejecting "other source" opinion evidence when the "reason that the ALJ offered for rejecting their opinions is that

---

[176] *Id.*

[177] *See* Cross-Motion – ECF No. 22 at 15. In its opposition to Ms. Raven-Jones's motion for summary judgement, the Commissioner also argues that any error by the ALJ in failing to consider Ms. Zeppa or any other "other source" testimony should be considered harmless error, citing *Molina*, 674 F.3d at 1111 ("we may not reverse an ALJ's decision on account of an error that is harmless"). As discussed below, the court does not find that these errors are harmless. *See Stout*, 454 F.3d at 1055–56.

[178] AR 28.

they are not 'acceptable medical sources' within the meaning of the federal regulation . . . [because] the regulation already presumes that nurses and counselors are non-acceptable medical sources, yet still requires the ALJ to consider them as 'other sources'"); *see also Taylor*, 659 F.3d at 1234 (providing that other source testimony may be introduced to show severity of impairment and its impact on the claimant's ability to work). The second reason, while accurate, also is not a legitimate or "germane" reason for the ALJ to discount or fail to consider Ms. Zeppa's testimony and evidence as an "other medical source," which again arguably provides relevant insight into the severity of Ms. Raven-Jones's impairments and her ability to work. *See Bruce*, 557 F.3d at 1115; *Taylor*, 659 F.3d at 1234.

Ms. Seppa had 23 separate, documented encounters with Ms. Raven-Jones, mostly at her home, and was able to observe firsthand the severity of her impairments and their impact on her ability to work.[179] The ALJ erred by failing to provide specific, legitimate, and germane reasons for discounting her "other source" opinion in these areas. *See Ghanim*, 763 F.3d at 1161; *Taylor,* 659 F.3d at 1234; *Bruce*, 557 F.3d at 1115.

### 3.1.2 Physical Impairments — Scleroderma and Lupus

The ALJ found that Ms. Raven-Jones had severe physical impairments of scleroderma and lupus with an alleged disability onset date of March 31, 2009.[180] Because Ms. Raven-Jones did not have treatment records for the period from March 2009 to November 2010, the ALJ relied on her medical records pre-dating her onset date from treatment she had received at Kaiser, where she was diagnosed with scleroderma and lupus.[181] The ALJ found that "[i]n terms of the scleroderma and lupus, the medial records contain limited diagnostic or clinical findings to account for [Ms. Raven-Jones's] alleged severity and functional limitations."[182] The ALJ gave "no weight" to the

---

[179] AR 858–72.

[180] AR 24 (ALJ also found that as of November 13, 2013, Ms. Raven-Jones had severe physical impairments related to injuries she sustained as a pedestrian in a motor vehicle accident and for which the ALJ found she was disabled; this portion of the ALJ's decision is not challenged on appeal).

[181] AR 24–25; *see also* AR 538, 545, 565–66, 609.

[182] AR 27.

2010 opinion of the State agency examining physician, Dr. Chen, because his "assessment was limited to one examination, and he was unable to consider evidence subsequent to his assessment," although the ALJ did cite Dr. Chen's CE when discussing Ms. Raven-Jones's reported daily activities.[183] The ALJ did not discuss Ms. Raven-Jones's 2010 examination at ACMC for scleroderma, where the doctor noted her skin lesions/pain in her hands and fingers, which were described as "'sausage' fingers."[184] The ALJ did note that in July 2012, Ms. Raven-Jones sought treatment for her scleroderma and had "presented a year later [July 2013] with similar complaints of pain in her hands and feet."[185] The ALJ concluded that based on this limited treatment history, Ms. Raven-Jones "did not appear to require extensive treatment that would suggest disabling symptoms and limitations."[186] As discussed above in the section on Ms. Raven-Jones's mental impairments, a claimant's lack of treatment can be evidence of the lack of severity of such claimant's reported symptoms. *See Orn*, 495 F.3d at 636.

The burden of proof is on Ms. Raven-Jones to establish both the nature and severity of her physical impairments at each of the first four steps of the five-step disability analysis process. *See Tackett*, 180 F.3d at 1098; *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995) ("claimant bears the burden of proving she is disabled" and "must produce complete and detailed objective medical reports of her conditions from licensed medical professionals"); *see also Andrews*, 53 F.3d at 1039–40 (even if evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision).

Despite Ms. Raven-Jones's burden of proof and the deferential standard by which this court reviews the ALJ's determination, the ALJ still must consider the entire record and provide specific, legitimate reasons supported by substantial evidence for its conclusions. *See Reddick*, 157

---

[183] AR 28; AR 25 (repeatedly citing Dr. Chen's CE (cited as document "4F") as evidence of Ms. Raven-Jones's capabilities to perform daily living activities).

[184] AR 716–17.

[185] AR 27–28 (note: the ALJ's record cite at AR 27 to "2F. pg. 12" is incorrect and appears that it should have been to "20F pg. 11–12" instead); *see also* AR 782–83, 778.

[186] AR 28.

F.3d at 725 (requiring "specific and legitimate reasons supported by substantial evidence in the record" to support the ALJ's decision); *see also Pinto v. Massanari*, 249 F.3d 840, 847–48 (9th Cir. 2001) (court will not affirm ALJ's decision on grounds not invoked by the ALJ in its decision); *Garrison*, 759 F.3d at 1010 (the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely").

Here, the ALJ's decision to give "no weight" to the medical opinion of Dr. Chen, the examining physician, is not based upon specific, legitimate reasons supported by substantial evidence.[187] *See Reddick*, 157 F.3d at 725. First, as discussed above, the fact that Dr. Chen's CE was based upon was a one-time examination does not by itself constitute a legitimate reason for rejecting the medical opinion of an examining physician. *See id.*; *see, e.g.*, *Wiggins*, 2017 WL 772142, at *8 ("all consultative examiners [are one-time snapshots,] and it is not a legitimate reason for rejecting the opinion"). Second, absent specific, subsequent evidence which would contradict or call into question the basis for the previous evaluation, the fact that Dr. Chen's CE does not reflect *subsequent* additional evidence is not a legitimate basis for giving "no weight" to an examining physician's medical opinion. Accordingly, it was an error for the ALJ to give no weight to Dr. Chen's CE based on those reasons.

At the time of the ALJ hearing, Ms. Raven-Jones's attorney also appeared to challenge Dr. Chen's CE on the basis that he had "been removed from the CE panel" for reasons of "quality" and "thoroughness" of his CEs.[188] In response, the ALJ indicated that she was aware of the situation and that she would give "no weight" to Dr. Chen's CE.[189] Ms. Raven-Jones's attorney responded, "Okay. Thank you, Your Honor."[190] The Commissioner has subsequently agreed, as part of a separate class-action settlement, to reopen certain disability cases if a claimant was examined by Dr. Chen. The settlement, however, provides that if "Dr. Chen's CE report was

---

[187] *Id.*

[188] AR 41.

[189] *Id.*

[190] AR 42.

explicitly afforded no weight in the analysis, that individual will not be eligible for another review of his or her claim." *See Hart v. Colvin*, No. 15-cv-00623-JST, 2016 WL 6611002, at *7 (N.D. Cal. Nov. 9, 2016). Neither party has raised this issue or made any explicit request with regard to the *Hart* class-action settlement to this court, though Ms. Raven-Jones's attorney does allege on appeal that it was an error for the ALJ to not consider Dr. Chen's CE in her analysis of Ms. Raven-Jones's physical impairments.[191] Given the colloquy at the ALJ hearing, Ms. Raven-Jones — through her counsel — arguably consented to the ALJ giving Dr. Chen's CE "no weight." It appears, however, that the ALJ did in fact give some consideration or weight to Dr. Chen's CE in her decision, if only to support her findings with regard to Ms. Raven-Jones's daily living activities — some of which were noted in Dr. Chen's CE.[192] Given these unique circumstances, including the *Hart* class-action settlement and the fact that Ms. Raven-Jones has been granted disability as of November 14, 2013 (presumably limiting the need or value of having an additional CE performed because there is now a fixed time period for which eligibility for disability benefits is at issues — *i.e.*, from March 31, 2009 to November 13, 2013), and this court's ultimate decision to remand the case for further proceedings, the court will remand with instructions to allow Ms. Raven-Jones's attorney to seek to include or not Dr. Chen's CE for consideration by the ALJ.

The ALJ also failed to discuss Ms. Raven-Jones's medical diagnosis and treatment at ACMC in 2010 for scleroderma.[193] The ALJ's failure to do so was an error. *See* 20 C.F.R. § 416.927(b) (ALJ must consider the entire case record, including each medical opinion in the record); *Garrison*, 759 F.3d at 1012–13 (ALJ's failure to explicitly consider a medical opinion is an error).

The ALJ also failed to consider testimony from Ms. Raven-Jones's social worker, Ms. Zeppa, regarding the severity of Ms. Raven-Jones's scleroderma and its impact on her ability to

---

[191] Motion for Summary Judgment – ECF No. 16 at 5; *see also* Appeals Council decision at AR 2 (specifically noting that it had considered the issues relating to the CE performed by Dr. Chen and finding that those issues did not provide a basis for granting review).

[192] *See, e.g.*, AR 25 (repeatedly citing Dr. Chen's CE (cited as document "4F") as evidence of Ms. Raven-Jones's capabilities to perform daily living activities).

[193] *See* AR 22–30; *see also* AR 716–17 (ACMC treatment notes from 2010).

function.[194] The ALJ also failed to consider testimony from Ms. Raven-Jones's older brother, who testified at the previous ALJ hearing about the severity and impact of his sister's impairments.[195] He related how her hands were swollen and bluish-green in color with "open sores" that "never close."[196] He discussed the difficulties she has using her hands and gripping things, and described that her fingernails looked as if they are about to "pop off."[197] He described how he or his wife would help his sister with fastening buttons, zippers, or other actions requiring her hands.[198]

The ALJ also failed to discuss the notations in the record from a social security representative, who met with Ms. Raven-Jones and noted that her hands were "bent and swollen" and that she reported that she was in "much pain."[199]

As with the evidence of Ms. Raven-Jones's mental impairments, the ALJ is required to consider the entire record, including "other source" testimony and evidence. *See Ghanim*, 763 F.3d at 1161; *Molina*, 674 F.3d at 1111; *Bruce*, 557 F.3d at 1115 ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work."); *Stout*, 454 F.3d at 1053. Such testimony is competent evidence and "cannot be disregarded without comment." *Nguyen*, 100 F.3d at 1467. The ALJ's failure here to consider the testimony of Ms. Zeppa or Mr. Wilson or the first-hand information from the social security representative about the severity and impact of her physical impairments was an error. *See Ghanim*, 763 F.3d at 1161.

Ms. Raven-Jones also contends that the ALJ erred in only placing "some weight" on the 2014 opinion letter from of Nurse Practitioner ("NP") Portnoy.[200] NP Portnoy wrote that she had seen

---

[194] *See, e.g.*, AR 53 (Ms. Zeppa noted how "difficult" it is for Ms. Raven-Jones to do certain tasks such as filling out forms, writing, or opening an envelope because of the "ulcers under her fingernails" caused by the scleroderma).

[195] AR 81–96.

[196] AR 82–83, 87.

[197] AR 82, 84–87.

[198] AR 84–86.

[199] AR 684.

[200] Motion for Summary Judgment – ECF No. 16 at 10–11; *see also* AR 29.

Ms. Raven-Jones only once and thus was unable to fully assess her ability to work full time (and deferred functional assessments to occupational and physical therapists).[201] But she could speak in general terms to the conditions and to her general impression of Ms. Raven-Jones's capacity.[202] Ms. Raven-Jones's complications from lupus and scleroderma with Raynaud's phenomena would typically create issues of chronic pain, endurance, and decreased manual dexterity.[203] On appeal, Ms. Raven-Jones argues that NP Portnoy should be treated as an "acceptable medical source."[204] While nurse practitioners are not generally considered "acceptable medical sources," *see Fernandez v. Barnhart*, 68 F. App'x 820, 821 (9th Cir. 2003) ("[a]s a therapist without a doctorate, [mental health therapist] does not meet the regulations' requirements for an 'acceptable medical source'"), the Ninth Circuit has held in certain circumstances, treating nurse practitioners as "acceptable medical sources" is warranted given their close working/consultative role with the treating physicians and other factors. *Taylor*, 659 F.3d at 1234 ("acceptable medical source" weight can be imputed to nurse practitioner who "work[ed] closely with, and under the supervision of" doctor); *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996) (nurse practitioner's opinion considered that of a doctor based on evidence of "numerous" consultations and "close[ ] supervision"); *but see Molina*, 674 F.3d at 1112 n.3 (noting that "[i]n holding that a nurse practitioner could be an acceptable medical source, *Gomez* relied, in part, on "regulatory [language which] has since been repealed").

Here, given NP Portnoy's limited interactions with Ms. Raven-Jones (having examined Ms. Raven-Jones only once at the time she wrote her letter) and the lack of evidence or clarity regarding her supervision or interaction with a treating physician, the ALJ did not err by not treating NP Portnoy as a "medical source" and discounting her opinion based on NP Portnoy's limited interactions with Ms. Raven-Jones. *Ghanim*, 763 F.3d at 1161; *see* 20 C.F.R.

---

[201] AR 856.

[202] *Id.*

[203] *Id.* (also documented her initial impression "that the patient's anxiety, in and of itself, is disabling and would make fulltime employment highly unlikely").

[204] Motion for Summary Judgment – ECF No. 16 at 10.

§ 404.1513(d) (2013) (nurse practitioners, physicians' assistants, and therapists are considered "other sources")[205]; *see also Acord*, 571 F. App'x at 522 (even treating physician can be accorded little weight by ALJ when medical opinion "reached . . . after one visit").

### 3.2 Ms. Raven-Jones's Testimony

The ALJ found Ms. Raven-Jones's testimony and other statements "with regard to the severity and functional consequences" of her mental and physical impairments to be "not fully credible" because of (i) her record of "noncompliance," including "considerable periods where she did not receive treatment," (ii) her "conflicting reports of alcohol and drug use," and (iii) her reliance on a social worker to "arrange her appointments and to provide resources," while evidencing "little difficulty going into San Francisco or attending her granddaughter's graduation."[206]

In assessing a claimant's credibility, an ALJ must make two determinations. *Garrison*, 759 F.3d at 1014. "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007) (internal quotations omitted)). Second, if the claimant has produced that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281).

Moreover, in order to have meaningful appellate review, the ALJ must explain its reasoning and "*specifically identify* the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102, 1103 (9th Cir. 2014) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing.") (internal quotations

---

[205] The Social Security Administration promulgated a new § 404.1513, effective as of March 27, 2017. The previous version, effective September 3, 2013, to March 26, 2017, was in effect as of the date of the ALJ's hearing.

[206] AR 28–29.

omitted). "That means '[g]eneral findings are insufficient.'" *Id.* at 1102 (quoting *Lester*, 81 F.3d at 834); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.") (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)). Moreover, the Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010. "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted).

Here, the ALJ found that Ms. Raven-Jones's "medically determinable impairments could reasonably be expected to cause the alleged symptoms"[207] and did not find that she was malingering.[208] As such, the ALJ must provide "specific, clear and convincing reasons for" rejecting Ms. Raven-Jones's testimony regarding the severity of her symptoms. *Garrison*, 759 F.3d at 1014–15.

The ALJ's first reason for finding Ms. Raven-Jones's testimony "not fully credible" was her noncompliance with treatment and the "considerable periods" in which she failed to seek treatment.[209] The "failure to seek treatment or follow a prescribed course of treatment" is a legitimate factor "in weighing a claimant's credibility" *Orn*, 495 F.3d at 636; *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). As discussed above, the Ninth Circuit has held that the ALJ should consider whether such failure is the result of underlying mental-health issues. *See Nguyen*, 100 F.3d at 1465 (court should not "chastise one with a mental impairment for the exercise of poor judgment in seeking" treatment) (internal quotations omitted); *Ferrando*, 449 F.

---

[207] AR 27.

[208] *See* AR 21–31.

[209] AR 29.

App'x at 611–12 ("[F]ailure to seek treatment . . . is not a clear and convincing reason to reject" evidence where claimant's "failure to seek treatment is explained, at least in part, by [the claimant's] degenerating condition.").

Here, given her treating psychologist's uncontroverted diagnoses of PTSD, depression, substance abuse, anxiety, and "panic disorder with agoraphobia," which often manifested itself in an inability of Ms. Raven-Jones to leave "her home or even from entering some rooms of her home,"[210] the court finds that the ALJ did not provide "specific, clear and convincing reasons for" rejecting the claimant's testimony based on her failure to seek treatment or follow a prescribed course of treatment.[211] *See Garrison*, 759 F.3d at 1014–15.

The ALJ's second reason for discounting Ms. Raven-Jones's testimony was the purported inconsistency of her testimony regarding her substance abuse.[212] A claimant's "inconsistencies in testimony" or statements are a legitimate factor "in weighing a claimant's credibility." *Orn*, 495 F.3d at 636. Here, the ALJ found that Ms. Raven-Jones "presented conflicting reports" of polysubstance abuse.[213] In its opposition to Ms. Raven-Jones's motion for summary judgement, the Commissioner cites to Ms. Raven-Jones's exam by Dr. El-Sokkary in September 2010 —

---

[210] AR 759–60, 800.

[211] *See also* Motion for Summary Judgment – ECF No. 16 at 18. In her motion, Ms. Raven-Jones also alleges that her financial difficulties prevented her from accessing treatment until 2014, when she was enrolled into Medi-Cal. In *Regennitter,* the Ninth Circuit held that if a claimant could not afford treatment, failure to seek treatment was not a legitimate basis for rejecting disability claim. 166 F.3d at 1297 (when the record establishes that the claimant could not afford treatment, lack of treatment is not a basis for rejecting a disability claim); *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995) ("'It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'") (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)); AR 74 (Ms. Raven-Jones's testimony that she did not have an ID because she could not afford it); AR 568 (2009 treatment notes reporting that Ms. Raven-Jones did not obtain her prescription because she could not afford her co-pay); AR 864 (June 2013, social worker noted that Ms. Raven-Jones was in a food-donation line when she called and expressed hope that she could obtain Medi-Cal coverage and return to Kaiser); *see also Ladue*, 1996 WL 83880, at *3 ("ALJ a has duty to develop the record" and "inform himself about [the] facts," even if "the claimant is represented by counsel."). It does not appear that this issue was raised by or with the ALJ. Because the court finds on other grounds that Ms. Raven-Jones's failure to seek or follow proscribed treatment was not a clear and convincing reason to discount her testimony, the court does not consider or rely on this additional basis.

[212] AR 29.

[213] *Id.*

where she claimed that she was "clean" from substance abuse between "2001 until 2008 when she relapsed and since September 2010" — with her reported statement to Dr. Chen the following month —where she said that "she drinks" — as an example of these inconsistencies or conflicting reports.[214]

As Ms. Raven-Jones notes in her reply brief,[215] however, the statements are not necessarily inconsistent given that there was no indication or finding in Dr. Chen's report that her alcohol consumption was to "abuse."[216] The Commissioner also noted that several years later, she self-reported that she "recently" began "consuming excessive alcohol in excess" and that other treatment notes show that she admitted her "binge use" of crack.[217] Again, none of these citations to Ms. Raven-Jones's various struggles with polysubstance abuse supports, by clear and convincing evidence, inconsistencies in Ms. Raven-Jones's testimony or statements. Thus, given the ALJ's failure to cite to other specific instances of conflict in Ms. Raven-Jones's reporting, the ALJ's second reason for rejecting the claimant's testimony — as "not fully credible" based on "conflicting reports of alcohol and drug use" — is not a clear and convincing reason supported by substantial evidence.[218] *See Garrison*, 759 F.3d at 1014–15.

The ALJ's third reason for discounting Ms. Raven-Jones's testimony was based on her reliance on a social worker to "arrange appointments and to provide resources," while evidencing "little difficulty going into San Francisco or attending her granddaughter's graduation."[219] A claimant's "inconsistencies . . . between testimony and conduct [or] daily activities" is a legitimate factor "in weighing a claimant's credibility." *Orn*, 495 F.3d at 636.

Here, the ALJ's determination that Ms. Raven-Jones "evidently had little difficulty" attending her granddaughter's graduation ceremony is not supported by substantial evidence. The ALJ's

---

[214] *See* Cross-Motion – ECF No. 22 at 18–19 (citing AR 662 & 665).

[215] *See* Reply – ECF No. 25 at 13.

[216] *See* AR 665.

[217] *See* Cross-Motion – ECF No. 22 at 19 (citing AR 742, 759, 767).

[218] *See* AR 29.

[219] *Id.*

determination is based primarily on a report from Ms. Raven-Jones's social worker, Ms. Zeppa.[220] In it, Ms. Zeppa details an encounter at Ms. Raven-Jones's home in June 2013: when Ms. Zeppa arrived, two family members were already present, and Ms. Jones indicated that she had just learned that her granddaughter was graduating that afternoon.[221] Ms. Raven-Jones said that although she was continuing to experience symptoms of lupus, scleroderma, anxiety, and depression, she wanted to go — even though she was "anxious" about going and "worried about being in a large crowd."[222] Ms. Zeppa helped to calm and reassure her, noting that it is "important that her granddaughter know she is there, and that [Ms. Raven-Jones] loves her and is proud of her."[223] Ms. Zeppa noted that this seemed to help "calm" her a little as she was "overwhelmed about staying in the crowd for the entire ceremony."[224] Given this description (which the ALJ relied on for her conclusion), the court finds that the ALJ's characterization of Ms. Raven-Jones's attendance at her granddaughter's graduation — to support her finding that Ms. Raven-Jones's testimony regarding the severity of her symptoms were "not fully credible" — is not a clear and convincing reason supported by substantial evidence. *See Garrison*, 759 F.3d at 1014–15.

Moreover, assume the court was to find that the ALJ's characterization of events was sufficiently supported by the record, such that the court was required to defer to the ALJ's findings. *See Andrews*, 53 F.3d at 1039 (if the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision). The court still would not find the ALJ's reference to this single event (particularly given its unique nature) sufficient as a clear and convincing basis for finding Ms. Raven-Jones's testimony "not fully credible." While a claimant's daily activities may provide a legitimate basis for a finding of inconsistency with her disabling conditions, *see Orn*, 495 F.3d at 636; *Molina*, 674 F.3d at 1113, the Ninth Circuit has "repeatedly warned that ALJs must be

---

[220] *Id.* (citing to AR 863–64, noted in the ALJ's decision as Exhibit 25F, pp. 7, 8).

[221] AR 863.

[222] *Id.*

[223] *Id.*

[224] *Id.*

especially cautious in concluding that daily activities are inconsistent" with eligibility for disability benefits. *Garrison*, 759 F.3d at 1017. In *Garrison*, the Ninth Circuit recognized that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," and found that "only if her level of activity were inconsistent with a claimant's claimed limitations would these activities have any bearing on her credibility." *Id.* at 1016 (quotations and citations omitted); *see also Smolen*, 80 F.3d at 1287 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits . . . .").[225]

The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen*, 80 F.3d at 1292); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court.") (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)).

In deciding whether to remand a social security case for further proceedings or for an immediate award of benefits, the Ninth Circuit has promulgated the "credit-as-true" rule. *See Garrison*, 759 F.3d at 1019–23; *Treichler*, 775 F.3d at 1100–02; *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *see also Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003); *Hammock v. Bowen*, 879 F.2d 498 (9th Cir. 1989). The credit-as-true rule applies to both "medical opinion evidence" and to "claimant testimony." *Garrison*, 759 F.3d at 1020. Under the credit-as-true rule, a reviewing court may credit as true evidence that was rejected during the administrative process and remand for an immediate award of benefits if: (1) the ALJ failed to provide "legally sufficient reasons" for rejecting the evidence; (2) "the record has been fully developed and further administrative proceedings would serve no useful purpose"; and (3) "if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on

---

[225] *See also* Cross-Motion – ECF 22 No. at 19–20. In its opposition/motion, the Commissioner cites to a broader range of daily activities which Ms. Raven-Jones purportedly is capable of to support the ALJ's credibility finding regarding Ms. Raven-Jones's testimony. The ALJ's credibility determination about Ms. Raven-Jones's testimony did not cite or rely on these other daily activities, and the court thus does not rely on those alternative grounds or explanations. *See Garrison*, 759 F.3d at 1010 (court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely").

remand." *Id.* (citing *Ryan*, 528 F.3d at 1202; *Lingenfelter*, 504 F.3d at 1041; *Orn*, 495 F.3d at 640; *Benecke*, 379 F.3d at 595; *Smolen*, 80 F.3d at 1292). If these three conditions are met, the court may remand for an award of benefits unless "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021; *see also McCartey*, 298 F.3d at 1076 (noting court's "discretion").

Generally, "'[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)) (alteration in original); *Treichler*, 775 F.3d at 1099, 1106 ("a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony;" if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.") (citations omitted); *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits."); *McCartey*, 298 F.3d at 1076 (remand for award of benefits is discretionary); *McAllister*, 888 F.2d at 603 (remand for award of benefits is discretionary); *Connett*, 340 F.3d at 876 (finding that a reviewing court has "some flexibility" in deciding whether to remand).

The court declines to apply the "credit as true rule" and will remand the case for further proceedings. While, as discussed above, the ALJ failed to provide "legally sufficient reasons" for finding Ms. Raven-Jones's testimony "not entirely credible" and for rejecting or discounting the "other source" and medical-opinion testimony and evidence, remand is useful to fully develop the record relating to Ms. Raven-Jones's disability claim. Potentially relevant issues may include, *inter alia*, whether sufficient evidence establishes an onset date of March 31, 2009 (given the gaps and limited treatment history in the earlier parts of the relevant period),[226] addressing any open

---

[226] *See, e.g.*, *Lair-Del Rio v. Astrue*, 380 F. App'x 694, 696–97 (9th Cir. 2010) (absence of contemporaneous records and no evidence of treatment by the opining health care professionals during the relevant time period is relevant in determining the onset date — which the claimant has the burden of proof to demonstrate).

1　questions relating to the severity of Ms. Raven-Jones's physical impairments, resolving the issue

2　related to the appropriate treatment and weighting (if any) of Dr. Chen's CE, assessing the impact

3　(if any) of Ms. Raven-Jones's apparent receipt of unemployment benefits after the alleged onset

4　date, [227] and determining, if the ALJ finds Ms. Raven-Jones to have been disabled for part or all of

5　the relevant period, whether her acknowledged polysubstance abuse during the relevant time

6　period affects her claim. [228]

7

8　　　　　　　　　　　　　　　　**CONCLUSION**

9　　　Ms. Raven-Jones's motion for summary judgment is granted, and the Commissioner's cross-

10　motion for summary judgment is denied. The court remands for further administrative proceedings

11　consistent with this order.

12

13　**IT IS SO ORDERED.**

14　　　Dated: April 25, 2017　　　　　　　　　　　　　　　_____

15　　　　　　　　　　　　　　　　　　　　　LAUREL BEELER
　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

16

17

18

---

19　[227] The court understands that the mere receipt of such benefits does not necessarily preclude a
claimant's ability to seek concurrent eligibility for disability, particularly if the claimant only holds
herself out as being eligible for part-time work. *See, e.g., Copeland v. Bowen*, 861 F.2d 536, 542 (9th

20　Cir. 1988); *Carmickle v. Comm'r*, 533 F.3d 1155, 1161–62 (9th Cir. 2008); *see also Ghanim,* 763 F.3d
at 1165 ("continued receipt" of unemployment benefits casts doubt on a claim of disability, but

21　evidence that claimant who sought but declined unemployment benefits within a month of the award
of such benefits supported claimant's claim of disability).

22
[228] "A finding of 'disabled' under the five-step inquiry does not automatically qualify a claimant

23　for disability benefits." *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). "Under 42
U.S.C. § 423(d)(2)(C), a claimant cannot receive disability benefits 'if alcoholism or drug

24　addiction would . . . be a contributing factor material to the Commissioner's determination that the
individual is disabled.'" *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting 42 U.S.C.

25　§ 423(d)(2)(C)) (alteration in original). Under the Social Security Act's regulations, "the ALJ must
conduct a drug abuse and alcoholism analysis" to determine "which of the claimant's disabling

26　limitations would remain if the claimant stopped using drugs or alcohol." *Id.* at 747 (citing 20
C.F.R. § 404.1535(b)). If a claimant's remaining limitations are still disabling, "the claimant's

27　drug addiction or alcoholism is not a contributing factor material to [her] disability." *Id.*
Conversely, if the claimant's remaining limitations are not disabling, "the claimant's substance

28　abuse is material and benefits must be denied." *Id.*